UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GROOP INTERNET PLATFORM INC., d/b/a TALKSPACE,<br><br>    Plaintiff,<br><br>    v.<br><br>PSYCHOTHERAPY ACTION NETWORK,<br><br>NANCY BURKE,<br><br>LINDA MICHAELS,<br><br>and<br><br>JANICE MUHR,<br><br>    Defendants. | Case No:<br><br>COMPLAINT AND JURY DEMAND |

## NATURE OF THE ACTION

1.      This defamation action arises out of the widespread dissemination of a letter, authored and published by Defendant Psychotherapy Action Network and its Co-Chairs (collectively "PsiAN"), falsely alleging that Plaintiff Groop Internet Platform, Inc., d/b/a Talkspace ("Talkspace") has defrauded—and violated ethical obligations owed to—the clients of Talkspace's online mental health platform.  The exact opposite is true.  Talkspace complies with all applicable ethical standards and its innovative online model has increased access to mental health treatment for millions of clients.  PsiAN's smear campaign against Talkspace was especially pernicious because PsiAN transmitted these radioactive accusations to the CEO of the most influential mental health organization in the country: the American Psychological Association, based in Washington, D.C.

1

2.     PsiAN considers Talkspace a serious threat to its mission and economic future because Talkspace's ground-breaking, technology-focused approach to mental health provides a more accessible, affordable, and convenient alternative to the traditional brick-and-mortar therapy performed by PsiAN's members and leadership.  Accordingly, PsiAN specifically targeted the APA—and repeated its defamatory lies about Talkspace on the APA's 5,000-member Division 39 Listserv—to inflict the most damage possible to Talkspace's reputation and prevent Talkspace from providing an incredible service to its clients.

3.     Talkspace brings this action to vindicate the truth, to restore its reputation as an industry leader, and to establish PsiAN's liability for the harm its false and defamatory statements have caused to Talkspace.  Talkspace seeks an award of compensatory damages for the reputational and economic harm caused by PsiAN's false accusations.  Talkspace also seeks an award of punitive damages to address the willful and malicious nature of Defendants' conduct in knowingly publishing these defamatory statements.  All proceeds that Talkspace receives from this lawsuit will be used to provide no-cost therapy to individuals in need.

## PARTIES

4.     Plaintiff Talkspace is a Delaware Corporation with its principal place of business at 33 West 60th Street, 8th Floor, New York, NY 10023.  Talkspace is the subject of the defamatory statements at issue in this action.

5.     Defendant PsiAN is an Illinois corporation that regularly conducts business in the District of Columbia.  PsiAN is a so-called advocacy group that authored, published and disseminated broadly the defamatory statements giving rise to this action.

6.     Defendant Nancy Burke is a natural person and a resident of Chicago, Illinois.  She serves as a Co-Chair of PsiAN and is personally responsible for authoring, publishing, and disseminating broadly the defamatory statements giving rise to this action.

7. Defendant Linda Michaels is a natural person and a resident of Chicago, Illinois. She serves as a Co-Chair of PsiAN and is personally responsible for authoring, publishing, and disseminating broadly the defamatory statements giving rise to this action.

8. Defendant Janice Muhr is a natural person and a resident of Chicago, Illinois. She serves as a Co-Chair of PsiAN and is personally responsible for authoring, publishing, and disseminating broadly the defamatory statements giving rise to this action.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between the Plaintiff and the Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. PsiAN's members and non-member online supporters are mental health professionals operating brick-and-mortar practices. Consequently, PsiAN is existentially opposed to Talkspace's mission to provide affordable, online therapy. The Defendants regularly target Washington, D.C., with individual letters, mailers, and other written correspondence to its members in the District, and its members regularly appear at speaking events, conferences, and conventions, including those held in the District of Columbia. The Defendants have directed letters to the APA's headquarters—located at 750 First Street, NE Washington, DC 20002.

11. This Court may exercise personal jurisdiction over the Defendants pursuant to District of Columbia Code § 13-423 because Defendants: (i) transacted business within the District of Columbia; caused tortious injury in the District of Columbia by acts committed within the District of Columbia; (iii) caused tortious injury in the District of Columbia by acts committed outside the District of Columbia while regularly doing business within, engaging in persistent conduct within, and deriving substantial revenue from services rendered within the District of

Columbia; and (iv) on information and belief, had an interest in, used, or possessed real property within the District of Columbia.

12.     The exercise of personal jurisdiction over the Defendants comports with the Due Process Clause of the United States Constitution for the reasons set forth above.

13.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims in this Complaint occurred in this District and significant damage to Talkspace's reputation occurred within the District of Columbia.

## FACTUAL ALLEGATIONS

*Talkspace Revolutionizes the Online Therapy Space
and Builds a Reputation as an Industry Leader.*

14.     Since its founding in 2012, Talkspace has developed a virtual clinic using a proprietary platform to connect practitioners with clients in need of mental health treatment. Currently, approximately 5,000 practitioners use Talkspace's mobile and internet technology to diagnose and treat clients.  Talkspace provides accessible and affordable licensed therapy to over five million individuals through its insurer and employer clients, and it has served over one million registered direct consumer clients who had limited or no access to mental healthcare benefits through their employers.

15.     The system is simple: potential Talkspace clients start by logging into [www.Talkspace.com](www.Talkspace.com).  Each client then completes an in-depth online assessment to identify each individual's specific therapy needs.  Clients then have the option of purchasing a plan—starting as low as $65 per week—and each client is matched with a practitioner that is suited to meet the client's specific therapeutic needs.

16. Many clients have found Talkspace to be a refreshing change from the traditional in-person therapeutic model. Its convenience, flexibility, and cost-effectiveness have resulted in thousands of clients opting out of brick-and-mortar therapy in favor of Talkspace's offerings.

17. Talkspace has been a disruptive force in the mental health therapy field since the company was founded in 2012 by Oren and Roni Frank. For more than a century, the field of psychotherapy has failed to harness a data-driven approach to treatment, and it has lagged behind several watershed technological advances. But Talkspace has helped bridge the gap between mobile technology and traditional brick-and-mortar therapy. Talkspace has overcome barriers to provide access to therapy for millions of individuals throughout the United States, and its innovations led to the commercialization of some of the earliest models of online therapy. Talkspace's platform enables its clients to communicate with thousands of licensed psychologists, counselors, marriage and family therapists, and clinical social workers (collectively "Practitioners"), via text, instant messages, and video conferencing—all at a fraction of the cost of traditional therapy. These innovations have made it possible for clients to communicate with Practitioners via their mobile devices in a secure, accessible, and client-friendly manner.

18. It comes as no surprise, then, that Talkspace's success in the market has disrupted traditional forms of therapy and offerings from brick-and-mortar offices. The traditional psychotherapy model relies on expensive brick-and-mortar offices which come with a hefty price tag to pay for staggering overhead costs. Thanks to recent technological advances, millions of Americans can obtain mental health services via the internet.

19. This ground-breaking platform has profoundly impacted underserved communities by increasing affordable access to mental health professionals.

20. Talkspace takes seriously its commitment to the safety of its clients. The company has adopted rigorous credentialing processes to recruit and retain a quality network of Practitioners and ensure the quality of the Practitioners' care.

21. Additionally, Talkspace has been certified as HIPAA/HITECH compliant and a private security firm has confirmed that Talkspace's procedures and protocols are consistent with state laws and ethical regulations concerning client confidentiality.

22. Talkspace has built a strong reputation over the last seven years, and this has attracted strategic partnerships with other health care providers and large-scale employers that provide therapy to employees. Over a million clients have accessed Talkspace's services.

### *Threatened by Talkspace's Success,*
### *PsiAN and Its Advisors Begin Their Smear Campaign Against Talkspace.*

23. PsiAN is an organization that describes itself as "a global community of mental health professionals and stakeholders dedicated to promoting psychotherapies of depth, insight and relationship." The overwhelming majority of its twenty-two members work or have worked in brick-and-mortar mental health practices.

24. Although many of the publications listed on PsiAN's online library address the need for new, cost-effective methods of providing treatment[1], PsiAN has opposed Talkspace since

---

[1] *E.g.,* R. Abramson, *A Cost-Effective Psychoanalytic Treatment of a Severely Disturbed Woman*, J. Amer. Acad. Psychoanal. (2001); CC. Berghout, J. Zevalkink, L. Hakkaart-van Roijen, *A cost-utility analysis of psychoanalysis versus psychoanalytic psychotherapy,* Int'l J. of Tech. Assessment in Health Care, 26(1): 3-10 (2010); J. Hall, S. Caleo, J. Stevenson, & R. Meares, *An economic analysis of psychotherapy for borderline personality disorder patients,* J. of Mental Health Policy and Econ., 4(1), 3-8 (2001); ME. Beutel, M. Rasting, U. Stuhr, B. Ruger & M. Leuzinger-Bohleber, *Assessing the impact of psychoanalyses and long-term psychoanalytic therapies on health care utilization and costs*, Psychotherapy Research, 14(2): 146-160 (2004); S. De Maat, F. Philipszoon, R. Schoevers, J. Dekker, F. De Jonghe, *Costs and benefits of long-term psychoanalytic therapy: Changes in health care use and work impairment*, Harvard Review of Psychiatry, 15(6), 289-300 (2007); M.G. Turri & L. Andreatta, *Does psychoanalytic psychotherapy offset use of mental health services and related costs in severe borderline personality disorder? – A case study,* PLOS ONE (Mar. 1, 2017), https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0171592; L. Hakkaart—Van Roijen, A. Van Straten, M. Donker, & B. Tiemens, *Handleiding Trimbos/iMTA questionnaire for costs associated with psychiatric illness (Tic-P)*, Rotterdam: Erasmus Universiteit (2002); J.A. Chiles, M.J. Lambert, & A.L. Hatch, *The impact of medical cost offset on practice and research,* Healthcare utilization and cost series 5 (2002); A.D. van Asselt, C.D.

its inception as they feel both the platform and its licensed practitioners cannot possibly duplicate the treatment effectiveness of PsiAN's members' traditional face to face therapy, regardless of rigorous research and studies that prove the opposite is true that online/remote therapy is just as effective as face-to-face therapy.[2]

25. While it is true that Talkspace and PsiAN both agree that there is a need for affordable and accessible therapy, Talkspace's business model poses an economic and existential threat to PsiAN's members, who, in reality, are slow-to-adapt, brick-and-mortar based providers.

26. One of PsiAN's primary advisors is a 62-year-old psychologist by the name of Todd Essig. Essig operates a lucrative brick-and-mortar clinic located in New York's exclusive Greenwich Village neighborhood. Essig caters to the wealthy and well-connected and charges his patients hundreds of dollars for each hour of therapy.

27. Essig has repeatedly attacked Talkspace and its business model because he also views the online therapy platform as an existential threat to his own brick-and-mortar clinic. Although Essig is not a journalist—he has zero training as such—he is a self-appointed blogger and a part-time, volunteer "contributor" to www.Forbes.com.

28. Talkspace's reputation for providing accessible, affordable, and effective treatment has recently led to partnerships with some of the largest health care insurers and other large-scale employers.

---

Dirksen, A. Arntz, J.H. Giesen-Bloo, R. Van Dyck, P. Spinhoven, et al., *Out-patient psychotherapy for borderline personality disorder: Cost-effectiveness of schema-focused therapy v. transference focused psychotherapy*, British J. of Psychiatry, 192(6), 450-457 (2008); S.G. Lazar, *Psychotherapy is Worth It: A Comprehensive Review of its Cost-Effectiveness*, American Psychiatric Publishing, Inc (2010)
[2] *The Research Behind Talkspace Online Therapy*, available online at, https://research.talkspace.com

its inception as they feel both the platform and its licensed practitioners cannot possibly duplicate the treatment effectiveness of PsiAN's members' traditional face to face therapy, regardless of rigorous research and studies that prove the opposite is true that online/remote therapy is just as effective as face-to-face therapy.[2]

25. While it is true that Talkspace and PsiAN both agree that there is a need for affordable and accessible therapy, Talkspace's business model poses an economic and existential threat to PsiAN's members, who, in reality, are slow-to-adapt, brick-and-mortar based providers.

26. One of PsiAN's primary advisors is a 62-year-old psychologist by the name of Todd Essig. Essig operates a lucrative brick-and-mortar clinic located in New York's exclusive Greenwich Village neighborhood. Essig caters to the wealthy and well-connected and charges his patients hundreds of dollars for each hour of therapy.

27. Essig has repeatedly attacked Talkspace and its business model because he also views the online therapy platform as an existential threat to his own brick-and-mortar clinic. Although Essig is not a journalist—he has zero training as such—he is a self-appointed blogger and a part-time, volunteer "contributor" to www.Forbes.com.

28. Talkspace's reputation for providing accessible, affordable, and effective treatment has recently led to partnerships with some of the largest health care insurers and other large-scale employers.

---

Dirksen, A. Arntz, J.H. Giesen-Bloo, R. Van Dyck, P. Spinhoven, et al., *Out-patient psychotherapy for borderline personality disorder: Cost-effectiveness of schema-focused therapy v. transference focused psychotherapy*, British J. of Psychiatry, 192(6), 450-457 (2008); S.G. Lazar, *Psychotherapy is Worth It: A Comprehensive Review of its Cost-Effectiveness*, American Psychiatric Publishing, Inc (2010)
[2] *The Research Behind Talkspace Online Therapy*, available online at, https://research.talkspace.com

29. In doing so, Talkspace underwent a litany of thorough investigations by the health care insurers' auditor and security officers which uniformly concluded that Talkspace is following all professional codes and ethical standards related to online therapy.

30. Given Talkspace's success and commitment to ethical and effective treatment, Practitioners have recently started prescribing medications when appropriate, using the video tool to comply with state and federal regulations. PsiAN observed Talkspace's high-profile success and, recognizing the substantial threat Talkspace posed to its membership, embarked on a long-term effort to derail Talkspace's success -- and discourage others from dealing with Talkspace -- by the publishing of false and damaging statements to Talkspace's key audiences. Essig provided material support and assistance to this effort.

31. *First*, PsiAN and Essig utilized the APA's broad network to recruit other individuals to transmit false accusations about Talkspace to TV networks and attempt to convince the networks to drop Talkspace advertisements which feature decorated Olympian and Talkspace spokesperson, Michael Phelps. Specifically, PsiAN and Essig utilized the Washington, D.C.-based APA's Society for Psychoanalysis and Psychoanalytic Psychology Division ("Division 39") Listserv to send a letter with false and defamatory statements about Talkspace to Division 39 members, along with the suggestion that members use the letter "as a template" to send their own letters to Talkspace advertisers. The Division 39 Listserv has more than 5,000 members.

32. *Second*, PsiAN sent a letter directly to Michael Phelps that repeats the false and defamatory accusations concerning Talkspace in order to disrupt the company's ability to advertise and attract additional clients.

33.     ***Third***, PsiAN encouraged its members and all those on the District 39 Listserv to send correspondence to pressure the APA into dropping Talkspace's sponsorship at the APA's summer convention.

34.     ***Finally***, Essig used his platform as a supposed "journalist" to draft a hit piece against Talkspace to propagate the false and preconceived narrative that the Talkspace platform is not "real psychotherapy."

35.     As a direct and proximate cause of the false statements and publicity campaign orchestrated by PsiAN and Essig, the APA canceled its partnership with Talkspace and prohibited it from advertising at one of the APA's largest national conferences.

36.     But PsiAN's defamatory statements created additional, independent harm to the thousands of therapists that utilize the Talkspace platform to treat patients. Talkspace relies on the dedication of these individuals to continue to operate and the company takes seriously its commitment to protecting therapists on its platform from unfair reputational attacks. Ironically, many of these therapists are associated with PsiAN, but the Defendants disregarded these facts and published damaging statements without considering the harm they would cause to their own constituents.

### *PsiAN Continues Its Smear Campaign by*<br>*Publishing Additional Defamatory Statements to the APA.*

37.     On May 29, 2019, Bloomberg published an article discussing both the latest investment round raised by Talkspace and a partnership between Talkspace and Optum—a unit of UnitedHealth Group—that would make the Talkspace application available to approximately two million Optum customers.

38.     The news of the Talkspace-Optum deal caused PsiAN to realize that, despite its prior false statements and efforts to damage Talkspace in the marketplace, Talkspace continued to

grow and was now capturing the largest insurer markets. Growing increasingly desperate to derail Talkspace's success, PsiAN stepped up its efforts to damage and defame Talkspace.

39. In June of 2019, PsiAN emailed a letter ("June 2019 Letter") to Arthur C. Evans, Jr., the CEO of the APA. PsiAN also mailed a copy of the June 2019 Letter to the APA's Washington, D.C., headquarters located at 750 First Street, NE Washington, DC 20002.

40. Through the following statements, in the June 2019 Letter, PsiAN sought to injure Talkspace's business and collaboration with Optum and the APA by falsely charging Talkspace with being unethical and defrauding consumers:

- "Talkspace's unethical business and professional practices"
- Talkspace poses a threat to the "ethical principles for psychologists"
- Talkspace's "business model virtually demands the violation of 'patient' protections, including those of confidentiality, dual relationship and safety"
- Talkspace's "business models and marketing messages … have been found to be examples of consumer fraud."

41. Shortly after sending the June 2019 Letter, PsiAN co-chair Linda Michaels—working jointly with the other co-chairs—sent a copy of the letter to the APA's Washington, D.C.-based District 39 Listserv. Michaels encouraged the more than 5,000 District 39 Listserv members—many of whom are also based in Washington, D.C.—to "[f]eel free to use [the letter] as a template and write a letter, too!"

### *PsiAN's Statements Charging Talkspace with Unethical Practices and Fraud are False.*

42. The above-referenced statements in the June 2019 Letter are demonstrably false.

43. Talkspace does not engage in consumer fraud.

44. Talkspace does not disregard relevant ethical standards concerning its platform. To the contrary, Talkspace complies with all applicable ethical standards and takes seriously its ethical obligations and the confidentiality of its clients' sensitive information.

45. Talkspace operates a virtual clinic where independent practitioners operate under their own licenses to provide mental health therapy to clients online.

46. Talkspace's practices comport with all applicable state laws and ethical regulations related to client confidentiality and standards of care.

47. Talkspace exceeds many professional guidelines concerning confidentiality and privacy.

48. Talkspace has been audited by a private and independent security firm, Compass IT Compliance, which confirmed that Talkspace is compliant with both HIPAA and HITECH regulations.

49. Talkspace has also successfully undergone extensive compliance investigations performed by the security teams at every one of the health care insurers and large-scale employers with which it partners.

50. Talkspace's Privacy Policy and Terms of Use demonstrate its commitment to ethics and the privacy, security, and safety of all of its clients.

51. Talkspace does not allow anyone other than the client's Practitioner to access records which contain personal identifiers. Talkspace has extremely restrictive rules addressing who can access even anonymized client records. These rules universally require either a client complaint or a substantiated clinical concern in order for one of a select number of licensed senior clinicians to access *de-identified* records in a "safe harbor" setting to ensure high quality of care.

52. This practice tracks the language of the APA's Record Keeping ethical rule 6.02(b)[3].

53. Talkspace's technology permits it to maintain a more protective confidentiality regime than exists in a typical brick-and-mortar office, like those promoted by PsiAN, where the clients' names and personal identifiers can be viewed by administrative office personnel and where client files are typically kept in original paper form.

54. PsiAN's statements alleging Talkspace violates patient protections by encouraging "dual relationships" is also false.

55. Talkspace's model does not demand that practitioners have "dual relationships." Talkspace's Terms of Use explain: "Talkspace does not employ the [Practitioners] matched through the Service." They are independent Practitioners who do not have a role in running the Talkspace platform, recruiting clients, or selling subscriptions; their only job is to provide therapy to their clients. Much like the traditional clinics PsiAN advocates for and has a financial interest in maintaining, Talkspace is a platform by which Practitioners offer their services.

56. The Practitioner Handbook that is posted on the Talkspace website states Practitioners are "licensed independent practitioners," who "exclusively provide Online Therapy."

57. PsiAN either willfully and recklessly avoided conducting the basic research on Talkspace's client confidentiality procedures or chose to ignore Talkspace's policies and publish this demonstrably false, damaging, and defamatory statement with knowledge of its falsity.

---

[3] The APA's Record Keeping ethical rule 6.02(b) states: "If confidential information concerning recipients of psychological services is entered into a database or systems of records available to persons whose access has not been consented to by the recipient, psychologists use coding or other techniques to avoid the inclusion of personal identifiers." APA, *Ethical Principles of Psychol. and Code of Conduct*, § 6(b), http://www.apa.org/ethics/code/.

58. Upon information and belief, PsiAN has read the Talkspace Terms of Use, Privacy Policy, Client and Practitioner FAQ's, Practitioner Handbook or it purposefully avoided reading the same in order to advance its false, preconceived narrative against Talkspace.

59. Talkspace has instituted policies and procedures to comply with all applicable standards for patient care and, as detailed above, has provided access to mental health treatment to more than one million individuals.

60. Talkspace has demanded that PsiAN retract the false and defamatory statements in its June 2019 letter, but PsiAN has refused to do so.

### *Following PsiAN's Defamatory Smear Campaign, Talkspace Suffered Significant Harm to Its Reputation and Standing in the Mental Health Field.*

61. Not surprisingly, PsiAN's false claims have been extremely damaging to Talkspace's reputation and business.

62. As PsiAN specifically intended, its false accusations harmed Talkspace's reputation and business with potential clients, insurance company partners, spokespersons, investors, the health care community, psychology organizations, and the general public.

63. Talkspace's general ability to procure new clients has also been impaired.

64. PsiAN's false and defamatory statements have also harmed Talkspace's general commercial relationships, have harmed its business standing, and have impaired its ability to enter into commercial relationships.

65. PsiAN's false and defamatory statements have also damaged Talkspace's reputation in the community and in the health care field.

66. In addition to reputational harm and detrimental impact on Talkspace's business, Talkspace has been damaged by having to expend resources to respond to the defamatory statements.

## **CLAIM FOR RELIEF – LIBEL PER SE**

67. Talkspace realleges and incorporates by reference each of the foregoing paragraphs as though fully set forth herein.

68. The Defendants wrote and published false and defamatory statements about Talkspace in the June 2019 Letter to the APA.

69. PsiAN's statements are of and concerning Talkspace and were understood by those who read them to be statements of fact about Talkspace.

70. Specifically, through the following statements, the Defendants alleged that Talkspace does not follow professional standards related to client confidentiality or have procedures for diagnosis and ongoing assessment of clients:

71. "Talkspace's unethical business and professional practices"

72. Talkspace poses a threat to the "ethical principles for psychologists"

73. Talkspace's "business model virtually demands the violation of 'patient' protections, including those of confidentiality, dual relationship and safety"

74. Talkspace's "business models and marketing messages … have been found to be examples of consumer fraud."

75. The Defendants accusations are false.

76. The Defendants accusations that Talkspace does not follow strict professional codes related to client confidentiality are also false because Talkspace is HIPAA compliant and follows all state laws and ethical regulations related to client confidentiality.

77. Talkspace has also been the subject of and passed extensive compliance investigations performed by the security teams at each of the large health care companies and employers it works with.

78. These findings are confirmed by Talkspace's Privacy Policy and Terms of Use. Talkspace *never* allows anyone other than the client's Practitioner to access records which contain personal identifiers. In fact, Talkspace has extremely restrictive rules around who can access even anonymized client records. These rules universally require either a client complaint or a substantiated clinical concern in order for one of a select number of licensed senior clinicians to access *de-identified* records in a "safe harbor" setting to ensure high-quality care.

79. This practice tracks the language of the APA's Ethical Principles of Psychol. And Code of Conduct 6.02(b) which states: "If confidential information concerning recipients of psychological services is entered into a database or systems of records available to persons whose access has not been consented to by the recipient, psychologists use coding or other techniques to avoid the inclusion of personal identifiers."

80. As is clearly outlined in the Practitioner Handbook, which is hyperlinked on Talkspace's website, Talkspace uses evidence-based criteria in assisting "Practitioners in providing appropriate interventions to address each phase of the treatment process." Talkspace promotes "treatment at the most appropriate, least intensive level of care necessary to provide safe and effective treatment to meet the individual client's needs." Practitioners use the Talkspace platform to provide services "for the purpose of preventing, diagnosing, or treating mental health or substance use conditions, disorders, or symptoms" that: (1) are medically appropriate for the symptoms, diagnosis or treatment of the condition, disorder or symptoms; (2) provide for the diagnosis, direct care, and treatment of the client's condition; (3) are in accordance with professional, evidence-based practice and care; and (4) are not primarily for the convenience of the Client or the Practitioner.

81. The Defendants acted with actual malice, showing intentional or reckless disregard for the falsity of its accusations about Talkspace.

82. The Defendants made these statements out of hostility and with the intent to harm Talkspace's business.

83. The Defendants' statements are defamatory per se because they have harmed Talkspace's business in the mental health field. The Defendants made false statements that Talkspace refuses to follow standards of care related to client confidentiality and as a result: (i) has touched on Talkspace's business for providing a safe and confidential platform that is compliant with all Professional Codes; and (ii) contains an imputation that is necessarily hurtful in its effect on Talkspace's business.

84. As a result of the false and defamatory accusations published by the Defendants, Talkspace's reputation has been impugned.

85. As a result of the false and defamatory accusations published by the Defendants, Talkspace's relationship with potential clients, health care companies, insurance providers, and others have been undermined.

86. As a result of the false and defamatory accusations published by the Defendants, confidence in Talkspace's integrity as a mental health provider has been undermined.

87. As a result of the false and defamatory accusations published by the Defendants, Talkspace's business and investments have been adversely affected in an amount yet to be determined.

88. As a result of the false and defamatory statements published by the Defendants, Talkspace has been forced to make an expenditure of money to remedy the situation.

89. In view of the foregoing, Talkspace is entitled to actual, presumed, and punitive damages in an amount to be specifically determined at trial.

90. Plaintiff Talkspace demands a trial by jury with respect to all issues properly triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Talkspace respectfully requests that the Court enter an award and judgment in its favor, and against Defendants, as follows:

(a) awarding Talkspace compensatory damages of not less than $10 million;

(b) awarding Talkspace punitive damages of not less than $30 million;

(c) awarding Talkspace all expenses and costs, including attorneys' fees; and

(d) such other and further relief as the Court deems appropriate.

Dated: June 24, 2019

*/s/ Thomas A. Clare, P.C.*
Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Shannon B. Timmann (D.C. Bar No. 1614929)
Daniel P. Watkins (*pro hac vice* pending)
CLARE LOCKE LLP
10 Prince Street
Alexandria, Virginia 22314
Telephone: (202) 628-7400
tom@clarelocke.com
daniel@clarelocke.com
shannon@clarelocke.com