# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GROOP INTERNET PLATFORM INC., d/b/a TALKSPACE, | |
| Plaintiff, | Civil Action No. 19-1854 (BAH) |
| v. | Chief Judge Beryl A. Howell |
| PSYCHOTHERAPY ACTION NETWORK, *et al.*, | |
| Defendants. | |

## MEMORANDUM OPINION

This case arises from a contentious debate over an alternative model for providing psychotherapy services that, in comparison to the "traditional psychotherapy model [of] expensive brick-and-mortar offices which come with a hefty price tag," Compl. ¶ 18, ECF No. 1, uses an online "proprietary platform to connect practitioners with clients in need of mental health treatment," *id*. ¶ 14. This online "business model" allegedly provides "more accessible, affordable, and convenient" therapy. *Id*. ¶¶ 2, 25. The plaintiff, New York-based Talkspace, has developed such a "virtual clinic," *id*. ¶ 14, which allegedly "poses an economic and existential threat to . . . slow-to-adapt, brick-and-mortar based providers," *id*. ¶ 25.

The plaintiff claims that its entry as a "disruptive force in the mental health therapy field," *id*. ¶ 17, prompted a defamatory "smear campaign" against it, *id*. ¶ 1, by the four defendants in this case: Chicago-based mental health practitioners Nancy Burke, PhD, Linda Michaels, PsyD MBA, and Janice Muhr, PhD, who are co-chairs of the fourth defendant, Chicago-based non-profit organization Psychotherapy Action Network ("PsiAN"). Specifically, in June 2019, the defendants sent a letter to the Washington, D.C. office of the American

1

Psychological Association ("APA"), expressing their "heightened" concerns about "treatment integrity, patient safety and therapist ethical obligations" due to the potential "alliance" between the plaintiff and a major health insurer. Decl. of Nancy Burke ("Burke Decl."), ECF No. 14-1, Ex. D ("2019 APA Letter") at 1, ECF No. 13-5. Less than three weeks after that letter was sent, plaintiff filed the instant action claiming the 2019 APA Letter constituted "libel per se" and demanding at least $40 million in damages. Compl. at 14–17.

The defendants have moved to dismiss the complaint, pursuant to Federal Rule of Civil Procedure 12(b)(2) and 12(b)(6), asserting that personal jurisdiction is lacking over each of the defendants and, alternatively, that the complaint fails to state a claim on which relief may be granted. Defs. PsiAN, Burke, and Michaels' Mot. to Dismiss the Compl. ("Defs.' Mot."), ECF No. 13; Def. Muhr's Mot. to Dismiss the Compl. ("Muhr Mot."), ECF No. 15.[1] Personal jurisdiction is indeed lacking, so the defendants' motions to dismiss are granted.

I.  **BACKGROUND**

In 2012, plaintiff set out to "[r]evolutionize[]" the world of mental health treatment by providing its clients with "affordable, online therapy." Compl. at 4 & ¶ 10. Since its founding plaintiff has built a network of "approximately 5,000 practitioners [who] use Talkspace's mobile and internet technology to diagnose and treat clients." *Id*. ¶ 14. Its online-therapy model has

---

[1] Defendant Muhr filed a separate motion to dismiss and supporting memoranda that are nearly identical to the motion and memoranda submitted by the other three defendants. *Compare* Muhr Mot. *with* Defs.' Mot.; *compare* Mem. of Points and Authorities in Support of Muhr Mot. ("Muhr Mem."), ECF No. 15, *with* Mem. of Points and Authorities in Support of Defs.' Mot. ("Defs.' Mem."), ECF No. 13; *compare* Reply Mem. of Points and Authorities in Further Support of Muhr Mot. ("Muhr Reply"), ECF No. 27 *with* Reply Mem. of Points and Authorities in Further Support of Defs.' Mot. ("Defs.' Reply"), ECF No. 26. For ease of reference, the memoranda filed by Burke, Michaels, and PsiAN, will be cited, except where salient differences necessitate separate reference to memoranda filed by Muhr. Although Muhr's motion seeks dismissal "for lack of *subject matter* jurisdiction," Muhr Mot. (emphasis added), this is treated as an apparent typographical error since the motion refers to Federal Rule of Civil Procedure 12(b)(2), which addresses the "lack of personal jurisdiction," and Muhr's other filings make clear that is her concern. *See, e.g.,* Muhr Mem. at 10 ("The complaint should be dismissed because this court lacks personal jurisdiction over Dr. Muhr." (capitalization altered)).

been used by "over five million individuals" and plaintiff has even enlisted Olympian Michael Phelps as its spokesperson. *Id*. ¶¶ 14, 31. The company's move away from the traditional in-person model of therapy, however, is not without its critics, members of PsiAN among them.

Plaintiff asserts that "PsiAN has opposed Talkspace since its inception." Compl. ¶ 24. The aspect of that opposition relevant to the instant action began in 2018 when Burke, Michaels, and Muhr, as co-chairs of PsiAN, sent two letters, one to Michael Phelps and another to the APA. In their letter to Phelps, they expressed "dismay and concern" that he had signed on as spokesperson for a "problematic treatment provider who aggressively sells an untested, risky treatment." Burke Decl., Ex. B ("Phelps Letter") at 1, ECF No. 13-3. They urged him to reconsider promoting text-based therapy because he "know[s] what works in real psychotherapy," which, according to defendants, is the kind of "intensive, inpatient, in-person treatment" that Phelps himself had undergone. *Id*.

Similarly, in their 2018 letter to the APA, the defendants expressed "dismay[] that the APA [had] chosen to promote so-called 'therapy' texting services like Talkspace in its publications." Burke Decl., Ex. A. ("2018 APA Letter") at 1, ECF No. 13-2. Among their concerns was a belief that "Talkspace 'therapies' are completely without a legitimate evidence base." *Id*. Moreover, the defendants claimed that "Talkspace demonstrates a clear intent to deceive the general public" by using Michael Phelps, who underwent in-person treatment, to push Talkspace's text-based therapy product. *Id*. The defendants also insisted that "ethical violations are systemically written into the very procedures [plaintiff] offers and advertises" and that plaintiff's "business model literally demands the violation of 'patient' protection[]" by allowing plaintiff's non-therapist employees to review patients' conversations for quality control.

3

*Id*. at 1–2.  They asked the APA to ensure that "any future advertisements it accepts from Talkspace not include false and deceptive statements."  *Id*. at 2.

What plaintiff characterizes as PsiAN's "smear campaign" did not end there.  Compl. ¶ 1. The plaintiff alleges that a New-York-based psychologist, Todd Essig, who is described as "[o]ne of PsiAn's primary advisors," Compl. ¶ 26, "sen[t] a letter with false and defamatory statements about Talkspace" to the "Society for Psychoanalysis and Psychoanalytic Psychology Division ('Division 39') Listserv," which is maintained by the APA and "has more than 5,000 members," *id*. ¶ 31, many of whom are allegedly "based in Washington, D.C.," *id*. ¶ 41.[2]  The complaint does not specify which of the 2018 letters was sent to the Division 39 listserv, though it may have been the Phelps Letter, which Burke, Michaels, and Muhr say *they* sent to the listserv.  Burke Decl. ¶ 10; Decl. of Linda Michaels ("Michaels Decl.") ¶ 10, ECF No. 13-20; Decl. of Dr. Janice Muhr ("Muhr Decl.") ¶ 10, ECF No. 15-1.  Essig's involvement *vel non* aside, the message encouraged members of the listserv to use the letter as a template to contact plaintiff's advertisers and the APA to encourage them to cease their relationships with plaintiff. Compl. ¶¶ 31, 33.  According to plaintiff, PsiAN's efforts were successful to the extent that "the

---

[2]  Plaintiff alleges that Todd Essig "provided material support and assistance" to PsiAN's "smear campaign," Compl. ¶¶ 1, 30, but despite complaining of his "repeated[] attack[s]" in five paragraphs of its complaint, *id*. ¶¶ 26, 27, 30, 31, 34, 35, fails to name Essig as a defendant for the obvious reason that to do so would defeat diversity jurisdiction, since plaintiff is a New York company, and thereby prevent the filing of this action in this Court.  This may be part of a fruitless attempt to seek application of D.C. law, notwithstanding that, under applicable choice of law principles, New York law would likely apply to the plaintiff's defamation claim.  *See Weyrich v. New Republic Inc.*, 235 F.3d 617, 626 (D.C. Cir. 2001) (noting that, in defamation cases the "weight of authority" counsels in favor of applying the law of "the place where the plaintiff suffered injury by reason of his loss of reputation" (internal quotation marks omitted)); *see also Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 457 (D.C. Cir. 1990) ("Quite clearly, economic loss resulting from defamation is most likely to be felt in one's place of business whatever the locus of its publication."); *accord Kamelgard v. Macura*, 585 F.3d 334, 341-42 (7th Cir. 2009) (explaining that under Illinois choice of law principles, "the law of the plaintiff's domicile" usually applies in defamation cases). Indeed, plaintiff makes no attempt to argue that New York law should not apply.  *See generally* Pl.'s Mem. in Opp'n to Defs.' Mot. ("Pl.'s Opp'n"), ECF No. 23.  As the defendants point out, without much contest from plaintiff, New York law is unfavorable to the merits of the plaintiff's defamation claim.  *See, e.g.*, Defs.' Mem. at 36 (citing *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) (noting that New York law provides a privilege to "defamatory communication[s] on any subject matter in which the party communicating has an interest" that is "made to a person having a corresponding interest" (internal quotation marks omitted))).

4

APA canceled its partnership with Talkspace and prohibited it from advertising at one of the APA's largest national conferences." *Id*. ¶ 35.

News then broke in May 2019 that plaintiff was on the brink of entering into a partnership with Optum, a health insurer. *Id*. ¶ 37. The agreement "would make the Talkspace application available to approximately two million Optum customers." *Id*. PsiAN responded by sending the 2019 APA Letter to the APA's Washington, D.C. office. *Id*. ¶ 39. In it, the defendants reiterated the concerns expressed in the 2018 APA Letter, namely that plaintiff's "business and professional practices" were "unethical." 2019 APA Letter at 1. Those concerns, they maintained, "ar[ose] from the business models and marketing messages" used by both plaintiff and Optum "that have been found to be examples of consumer fraud." *Id*. Plaintiff's business model, they said, "virtually demands the violation of 'patient' protections, including those of confidentiality, dual relationship and safety." *Id*. at 2. Given that the APA had responded to their last letter by cutting off its relationship with plaintiff, the defendants believed that the APA would "share [their] alarm at the news of [the] collaborative agreement" between plaintiff and Optum as posing "a threat to the 'therapists' and 'patients' who are directly involved" along with "the ethical principles for psychologists for which APA is the standard-bearer." *Id*. at 1. Michaels sent a copy of the letter to the District 39 Listserv, adding that members should "[f]eel free to use [the letter] as a template and write a letter, too!" Compl. ¶ 41 (internal quotation marks omitted).

Not long after, plaintiff filed this action, asserting that the statements in the defendants' "June 2019 Letter are demonstrably false," *id*. ¶ 42, because plaintiff "does not engage in consumer fraud," "does not disregard relevant ethical standards," and its "practices comport with all applicable state laws and ethical regulations related to client confidentiality and standards of

5

care," *id*. ¶¶ 43–46. Indeed, plaintiff contends that "PsiAN either willfully and recklessly avoided conducting the basic research on Talkspace's client confidentiality procedures or chose to ignore Talkspace's policies" and publish the letter anyway. *Id.* ¶ 57. Consequently, plaintiff seeks $10 million in compensatory damages and $30 million in punitive damages to repair the "extreme[] damage[e]" the letter has done to "Talkspace's reputation and business." *Id.* ¶ 61.

## II. LEGAL STANDARD

Although the defendants assert that this case should be dismissed either for lack of personal jurisdiction under Federal Rule of Procedure 12(b)(2) or for the plaintiff's failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), *see* Defs.' Mot., because personal jurisdiction is lacking, only the legal standard for motions under Rule 12(b)(2) need be discussed.[3] To survive a motion to dismiss under Rule 12(b)(2), the plaintiff must "'make a *prima facie* showing of the pertinent jurisdictional facts.'" *Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (quoting *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988)). The *prima facie* showing requires specific factual allegations connecting each defendant to the forum. *First Chicago Int'l*, 836 F.2d at 1378. Conclusory statements and bare allegations are insufficient. *Livnat*, 851 F.3d at 57. Unlike a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA,* 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)). Indeed, jurisdictional arguments may be

---

[3] Absent personal jurisdiction, consideration of the Rule 12(b)(6) motion would be improper. *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018) ("[I]t is clear that, when personal jurisdiction is in question, a court must first determine that it possesses personal jurisdiction over the defendants before it can address the merits of a claim."); *Forras v. Rauf*, 812 F.3d 1102, 1105 (D.C. Cir. 2016) ("Ordinarily, determining jurisdiction is a federal court's first order of business" since "'[w]ithout jurisdiction the court cannot proceed at all in any cause.'" (quoting *Ex parte McCardle*, 74 U.S. (7 Wall.) 506, 514 (1868)).

premised on the "pleadings, bolstered by such affidavits and other written materials as [the parties] can otherwise obtain." *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005). "When deciding personal jurisdiction without an evidentiary hearing—as here—the 'court must resolve factual disputes in favor of the plaintiff.'" *Livnat*, 851 F.3d at 57 (quoting *Helmer v. Doletskaya*, 393 F.3d 201, 209 (D.C. Cir. 2004)). The Court, however, "'need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts.'" *Id.* (quoting *Helmer*, 393 F.3d at 209).

## III. DISCUSSION

Determining whether personal jurisdiction exists over any defendant in this case is a "two-part inquiry." *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000). First, a statutory basis for personal jurisdiction must be located. *Forras v. Rauf*, 812 F.3d 1102, 1105–06 (D.C. Cir. 2016). Second, if a statutory basis is found then the Court must "determine whether an exercise of jurisdiction would comport with constitutional limitations." *Id.* at 1106 (citing *GTE New Media Servs., Inc.*, 199 F.3d at 1347). Federal courts sitting in diversity jurisdiction look to state statutes in undertaking the first step. FED. R. CIV. P. 4(k)(1)(A) (explaining that service of legal process "establishes personal jurisdiction over a defendant . . . who is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located"); *see also Gorman v. Ameritrade Holding Corp.*, 293 F.3d 506, 509 (D.C. Cir. 2002) ("[P]ersonal jurisdiction over nonresident defendants depends upon state law.").

The laws of the District of Columbia provide for two types of personal jurisdiction: general, *see* D.C. CODE § 13-422, and specific, *see id.* § 13-423, but only the latter is at issue in this case. *See* Compl. ¶ 11 (relying entirely on D.C. CODE § 13-423 for the propriety of personal

7

jurisdiction). The D.C. "long-arm" statute, section 13-423, describes several circumstances in which personal jurisdiction is proper. The plaintiff asserts that personal jurisdiction may be exercised over each defendant pursuant to subsection 13-423(a)(4).[4] That subsection provides:

> (a) A District of Columbia court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a claim for relief arising from the person's . . .
>
> > (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.

D.C. CODE § 13-423(a)(4).

This statute sets out two requirements for the exercise of specific jurisdiction "as to a claim for relief." *Id.* § 13-423(a). First, a plaintiff must allege that the defendant "caus[ed] tortious injury *in* the District of Columbia by an act or omission *outside* the District," *id.* § 13-423(a)(4) (emphasis added), hence its occasional nickname, the "act out/impact in" subsection. *See Crane v. Carr*, 814 F.2d 758, 762 (D.C. Cir. 1987) (Ginsburg, J.). Second, recognizing that allowing for personal jurisdiction any time an act outside of the District caused an injury within the District might open the courthouse doors too wide, Congress insisted that plaintiffs show "something more" before haling a defendant into this Court. *Id.* at 761. Specifically, to invoke subsection (a)(4) the plaintiff must demonstrate that each defendant (1) "regularly does or solicits business" here, (2) "engages in any other persistent course of conduct" here, or (3) "derives substantial revenue from goods used or consumed, or services rendered" here. D.C.

---

[4]   The complaint alleges that the exercise of jurisdiction is appropriate under four subsections of the long-arm statute, Compl. ¶ 11 (asserting jurisdiction is proper under D.C. CODE § 13-423(a)(1), (3)–(5)), prompting the defendants to resist personal jurisdiction under all four bases, *see* Defs.' Mem. at 12–18. In opposition, however, plaintiff retreats from all but one basis by addressing only whether jurisdiction is proper under D.C. Code § 13-423(a)(4). Pl.'s Opp'n at 8–20. Thus, plaintiff has conceded that jurisdiction is proper, if at all, only under subsection (a)(4). *Hopkins v. Women's Div., General Bd. of Global Ministries*, 284 F. Supp. 2d 15, 25 (D.D.C. 2003) ("It is well understood in this Circuit that when a plaintiff files an opposition to a dispositive motion and addresses only certain arguments raised by the defendant, a court may treat those arguments that the plaintiff failed to address as conceded.").

CODE § 13-423(a)(4). These plus factors aid in weeding out cases in which the in-District injury "is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum." *Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981) (Ginsburg, J.). Each requirement is addressed below.

### A. The Complaint Adequately Alleges, as to Each Defendant, an Out-of-District Act that Caused an In-District Injury

The first requirement—an out-of-District act that caused an in-District injury—is easily met in this case. The allegedly defamatory 2019 APA Letter was authored and signed by the three individual defendants on behalf of PsiAN while they were in Illinois, constituting the requisite out-of-District act. 2019 APA Letter at 2; Burke Decl. ¶ 12; Michaels Decl. ¶ 11; Muhr Decl. ¶ 11; *see also Forras*, 812 F.3d at 1107 (explaining that, pursuant to "extensive" and "controlling" caselaw "author[ing] . . . an allegedly defamatory article" outside the District is not an act "in the District" (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1300 (D.C. Cir. 1996))); *Crane*, 814 F.2d at 761 (finding that a libelous letter authored in and sent from New York "was not an act *in* the District" (emphasis in original)).

The plaintiff also alleged that the letter was "mailed . . . to the APA's Washington, D.C., headquarters," constituting the requisite in-District injury. Compl. ¶ 39. As the Supreme Court has noted, "[t]he tort of libel is generally held to occur wherever the offending material is circulated." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 777 (1984). Even where a plaintiff is relatively unknown, "the libel may create a negative reputation among the residents of a jurisdiction where the plaintiff's previous reputation was, however small, at least unblemished." *Id.* The defendants' suggestion that "the brunt of the alleged harm to [the plaintiff's] economic interest was surely felt" in New York or Delaware—where the plaintiff has its principal place of business and is incorporated, respectively—changes nothing. Defs.' Reply at 9. For decades in

this Circuit, cases like this one have been found to meet the act out/impact in subsection's threshold requirement. *See, e.g., Steinberg*, 672 F.2d at 928, 931 (holding the first requirement met when a message was sent from France to Washington, D.C., allegedly defaming a Florida man).

### B. No Plus-Factor Justifies Personal Jurisdiction over Any Defendant

Determining if the second statutory requirement is met calls for a defendant-by-defendant review of whether each "regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia." D.C. CODE § 13-423(a)(4). The thrust of plaintiff's argument is that each defendant has "engaged in a persistent course of conduct" in this District. Pl.'s Opp'n at 10 (capitalization altered). The jurisdictional allegations asserted as to PsiAN and the individual defendants are addressed separately in turn.

#### 1. *PsiAN*

As to PsiAN, the plaintiff marshals a laundry list of facts that it says establish the propriety of personal jurisdiction over the Chicago non-profit organization, but none of these alleged facts either individually or taken altogether suffice. The plaintiff's jurisdictional allegations can be grouped into three categories: (1) conduct related to PsiAN's website, Pl.'s Opp'n at 12 (noting that PsiAN maintains an "interactive website" that is available "24 hours each day to residents of the District of Columbia," encourages visitors to sign up for PsiAN's emails, to sign a "PTSD Petition," and has a "Donate" button to solicit donations to the organization); (2) communications with Washington, D.C. residents, *id*. at 13 (noting PsiAN "regularly transmits" communications to members, including those in D.C., as well as to the D.C.-based Division 39 Listserv, and sends letters to the APA, the Secretary of Education, U.S. Representative Donald Norcross, who is the Vice-Chair of a bipartisan task force on addiction,

and other Washington, D.C. entities, "with the hope of influencing their action in the District on a bevy of issues"); and (3) D.C.-based trade association membership, *id.* at 13 (noting that PsiAN is a member of the D.C.-based Mental Health Liaison Group ("MHLG")).

The third category of allegations, as the simplest, will be resolved first. D.C.'s unique role as the seat of the federal government means that countless trade associations are located here. They serve as the collective voices of their respective industries, ensuring those industries' interests are accounted for in the design of and debates over laws and policies that might affect the associations' members across the country. Subjecting a party to the jurisdiction of this Court by dint of its membership in an organization whose purpose is communicating with lawmakers and other government officials would come perilously close to subjecting that same organization to personal jurisdiction for contacting the lawmakers itself, something which D.C. courts have understandably been loath to do. *Companhia Brasileira Carbureto De Calcio v. Applied Indus. Materials Corp.*, 35 A.3d 1127, 1133 (D.C. 2012) (explaining that "entry into the District of Columbia by nonresidents for the purpose of contacting federal governmental agencies is not," except in limited circumstances, "a basis for the assertion of in personam jurisdiction" (quoting *Envtl. Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.*, 355 A.2d 808, 813 (D.C. 1976) (en banc))). For that reason, courts in this District have flatly refused to consider trade association membership in the jurisdictional inquiry. *See Jung v. Ass'n of Am. Med. Colls.*, 300 F. Supp. 2d 119, 139 (D.D.C. 2004) ("[I]t is established that the 'government contacts' exception [to the D.C. long-arm statute] extends 'to non-resident contact with trade associations located [within] the District of Columbia.'" (quoting *World Wide Minerals Ltd. v. Republic of Kazakhstahn*, 116 F. Supp. 2d 98, 105–06 (D.D.C. 2000))). PsiAN's membership in the D.C.-based MHLG, a "coalition of national organizations focused on mental health advocacy," Reply Decl. of Linda

Michaels ("Michaels Reply Decl.") ¶ 3, ECF No. 26-1, cannot play a role in determining this Court's jurisdiction over PsiAN.

The other facts put forth by Plaintiff in its attempt to establish a plus factor are likewise unavailing. To begin, "personal jurisdiction surely cannot be based solely on the ability of District residents to access the defendants' website[], for this does not by itself show any persistent course of conduct by the defendants in the District." *GTE New Media Servs. Inc.*, 199 F.3d at 1349. Before a website may be considered part of a defendant's course of conduct in the District, courts have required "a certain level of interactivity by the user." *Parisi v. Sinclair*, 806 F. Supp. 2d 93, 97 (D.D.C. 2011) (citing *Blumenthal v. Drudge*, 992 F. Supp. 44, 56 (D.D.C. 1998)). The requisite level of interactivity is far from clear, but the interactive features must, in some way, connect the website to the District. *See Parisi*, 806 F. Supp. 2d at 97 (finding no persistent course of conduct in the District when there was no showing that the "website somehow targets D.C. residents and/or has interactive forums that allow . . . visitors to interact with [the defendant] or with one another"); *see also Sweetgreen, Inc. v. Sweet Leaf, Inc.*, 882 F. Supp. 2d 1, 6 (D.D.C. 2012) (finding subsection (a)(4) was not satisfied when the content of a website "was not purposely directed toward the District of Columbia" (internal quotation marks omitted)). Mere interactivity, moreover, is not sufficient—"at least some other non-internet related contacts between the defendant and the forum" are required. *Parisi*, 806 F. Supp. 2d at 97.

Plaintiff calls PsiAN's website "interactive" because it encourages visitors to "subscribe to PsiAN's daily emails," sign a "PTSD Petition," and donate to the organization. Pl.'s Opp'n at 12. It also notes that the website is accessible "24 hours each day," which it says "is akin to a 24-hour a day news radio or television station broadcasting in the District of Columbia." *Id.*

The ubiquity of websites like PsiAN's that contain these basic interactive features lays bare why, without more, such websites cannot properly be thought to create a "persistent course of conduct" in the District, lest long-arm statutes like D.C.'s are to award plaintiffs a jurisdictional windfall. *Cf. Doe I v. State of Israel*, 400 F. Supp. 2d 86, 121 (D.D.C. 2005) (finding that a "website [that] accepts donations, facilitates communication, and supports the exchange of contact information . . . is no more 'interactive' than any basic website," especially when that website targeted an audience outside the District).

Plaintiff's reliance on two cases as support for the proposition that PsiAN's website establishes the organization's alleged persistent course of conduct in the District, is misplaced for several reasons. Pl.'s Opp'n at 10–12 (citing *Blumenthal*, 992 F. Supp. 44 and *Lewy v. S. Poverty Law Ctr., Inc.*, 723 F. Supp. 2d 116 (D.D.C. 2010). First, the websites addressed in those cases each had a level of interactivity with the District that far outstrips that presented by PsiAN's website. In *Blumenthal*, a case concerning a defamatory article posted to the "Drudge Report," the court determined that, while the defendant's website did allow for subscription to and receipt of a newsletter and solicited donations like PsiAN's does, it also allowed visitors "to directly e-mail defendant Drudge." *Blumenthal*, 992 F. Supp. at 56. Moreover, that website was devoted to "'inside the Beltway' gossip and rumor," and the defendant knew that D.C. residents represented a substantial portion of his website's devotees because the goings-on in this District were its near-exclusive focus. *Id*. at 57. Similarly, in *Lewy*, the defendant's website was used to "create[] a network of contacts in the District" to facilitate the distribution of "thousands of copies of its magazines and solicit millions of dollars in donations." *Lewy*, 723 F. Supp. 2d at 126. By contrast, the evidence presented thus far shows that PsiAN has collected two donations for a total of $350 from D.C. residents, Michaels Reply Decl. ¶ 2, and not even plaintiff suggests

13

that the website's content is aimed at this District any more than at any district where there are psychotherapists.

Second, and more importantly, both *Blumenthal* and *Lewy* make crystal clear that, even if PsiAN's website were sufficiently interactive with D.C. residents, plaintiff would also need to show "substantial" non-internet contacts. *Lewy*, 723 F. Supp. 2d at 124; *Blumenthal*, 992 F. Supp. at 56 ("[T]here must also be some other non-Internet related contacts between the defendant and the forum."). In *Blumenthal* such contacts included an interview the defendant conducted on C-SPAN to promote his website and numerous "contacts with District residents" who provided the defendant with "gossip for the Drudge Report." *Blumenthal*, 992 F. Supp. at 57. In *Lewy*, the defendant mailed thousands of magazines into the District, sent its employees here "for training programs and conferences," "collected information on hate groups in the District" and "collect[ed] information in the District for its website and national publications." *Lewy*, 723 F. Supp. 2d at 126–28. Apart from its website and its membership in a trade association, the only non-internet contacts Plaintiff alleges PsiAN has with the District are a string of letters and emails sent to District residents.

Those letters are not properly considered as part of PsiAN's alleged persistent course of conduct in D.C. As an initial matter, the handful of communications between PsiAN and District residents identified by the plaintiff can hardly be described as "persistent." D.C. CODE § 13-423(a)(4). Indeed, two of those communications were sent to the Secretary of Education and a United States Representative and must be ignored, winnowing the list of potential jurisdictional hooks even further. *Companhia Brasileira Carbureto De Calcio*, 35 A.3d at 1133 (explaining that contacts with government officials cannot be considered in determining personal jurisdiction). More to the point, however, letters and e-mails written in Illinois and sent into the

14

District, like all of the communications plaintiff attempts to leverage to create jurisdiction, are not conduct "*in* the District." *Crane*, 814 F.2d at 761 (emphasis in original). It would be passing strange to call a defamatory letter written outside the District an out-of-District act for purposes of subsection (a)(4)'s threshold requirement, *see supra* Part III.A, only to turn around and characterize other letters written outside and sent to the district as part of a "persistent course of conduct . . . *in* the District." D.C. CODE § 13-423(a)(4) (emphasis added). *Cf. Tavoulareas v. Comnas*, 720 F.2d 192, 194 (D.C. Cir. 1983) (Scalia, J.) (finding that defamatory telephone calls made outside the District to District residents could not constitute "a persistent course of conduct *in the District*" (emphasis in original)); *see also Nuevos Destinos, LLC v. Peck*, No. 15-cv-1846, 2019 WL 78780, at *11 (D.D.C. Jan. 2, 2019) ("Sending emails . . . to District residents does not constitute conducting 'regular business' or engaging in a 'persistent course of conduct' in the District of Columbia.").

None of the three categories of alleged in-District conduct, on their own or taken together, is sufficient to establish that PsiAN has engaged in a "persistent course of conduct . . . in the District of Columbia." D.C. CODE § 13-423(a)(4). Personal jurisdiction over PsiAN in this Court is therefore lacking.

### 2. *Individual Defendants*

Plaintiff's argument for personal jurisdiction over the individual defendants fares no better. Of the six facts plaintiff brings forth to connect the Chicago therapists to the District of Columbia, three concern letters and emails sent from Illinois to District residents. Pl.'s Opp'n at 14. As discussed above, this cannot be considered conduct in the District, let alone *persistent* conduct. All that remains are allegations that "Defendant Burke has attended at least one academic conference in the District" and has visited "multiple times in the last several years,"

15

allegations that "Defendant Muhr has admitted that she travels to Washington, D.C., with some regularity" and has done so "repeatedly since 2016," and finally an allegation that "Defendant Muhr possessed a property interest in the District when this lawsuit was filed." *Id*.

Without the allegations concerning communications with D.C. residents, there is thus nothing to suggest that defendant Michaels has engaged in regular business or a persistent course of conduct here. Nor do the other allegations related to Burke and Muhr provide a basis for jurisdiction. Burke "attended an academic conference in the District of Columbia approximately 15-20 years ago," and was a guest at a wedding here "17 years ago." Burke Decl. ¶ 7. She has also come to the district "twice in recent years for personal trips." *Id*. If "persistent" is to have any meaning, four trips over twenty years falls far short of coming within the long-arm statute's ambit. *Cf. Lewy*, 723 F. Supp. 2d at 124 ("Occasional travel to the District is . . . insufficient" to "establish a 'persistent course of conduct' in the District."). Likewise, Muhr's spring break trip to the District 24 years ago and her four visits to her daughter, who was attending school here, are woefully inadequate. Muhr Decl. ¶ 7. Plaintiff's assertion that Muhr possessed a property interest in the District is a reference to the fact that Muhr acted as guarantor on her daughter's D.C. lease. *Id*. This apparent attempt to create jurisdiction under another subsection of the long-arm statute, *see* D.C. CODE § 13-423(a)(5) (allowing for personal jurisdiction over a defendant who has "an interest in . . . real property in the District"), also fails. *See Scahill v. District of Columbia*, 909 F.3d 1177, 1186 (D.C. Cir. 2018) (explaining that status as a guarantor for a lease does not, on its own, create a property interest in the leased property).

With in-District conduct thinner even than PsiAN's, the exercise of personal jurisdiction over the individual defendants is improper.

16

### C. Jurisdictional Discovery is Not Warranted

Plaintiff urges that in the event the current record is found to be insufficient to support personal jurisdiction—as it is—discovery should be permitted "tailored to address matters relating to personal jurisdiction." Pl.'s Opp'n at 18. Jurisdictional discovery "is appropriate where the existing record is 'inadequate' to support personal jurisdiction and 'a party demonstrates that it can supplement its jurisdictional allegations through discovery.'" *Trintec Indus., Inc. v. Pedre Promotional Prods., Inc.*, 395 F.3d 1275, 1283 (D.C. Cir. 2005) (quoting *GTE New Media Servs., Inc.*, 199 F.3d at 1351–52). That demonstration need not be substantial, and discovery may be warranted so long as the plaintiff "provide[s] just enough of a good faith basis to raise the specter of jurisdiction." *Delta Sigma Theta Sorority, Inc. v. Bivins*, 215 F. Supp. 3d 12, 15 (D.D.C. 2013). All the same, whether to award jurisdictional discovery is a choice left to this Court's discretion and need not be permitted if such an award "would amount to nothing more than a fishing expedition." *FC Inc. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008) (quoting *Bastin v. Fed. Nat'l Mortg. Ass'n*, 104 F.3d 1392, 1396 (D.C. Cir. 1997)).

Plaintiff proposes several avenues for potential jurisdictional discovery. If allowed, plaintiff intends to 1) ascertain who controls PsiAN's website, 2) "[i]dentify the individual Defendants' contacts with the forum" other than those already alleged and admitted; 3) determine whether PsiAN has made any attempts to solicit D.C.-based mental health professionals to join the organization; 4) "[d]iscover all efforts to solicit . . . donations" from D.C. residents," 5) ascertain "the extent to which PsiAN obtains revenue from this District," 6) determine whether the defendants have disseminated any publications, letters, or "other communications" in the District, 7) "[i]dentify the trade groups and professional associations"

17

with which the Defendants are associated, and 8) "[a]scertain the full extent of the business PsiAN transacts in the District." Pl.'s Opp'n at 20.

As the discussion above demonstrates, several of these proposed routes for discovery will lead nowhere. First, PsiAN's website is only minimally interactive, so determining who *controls* that website will not substantiate the claim that the defendants have engaged in a persistent course of conduct in this District. In any case, the individual defendants have admitted that they "operate [the] website from Illinois." Michaels Reply Decl. ¶ 1. With respect to PsiAN's potential efforts to recruit D.C. members, plaintiff has made no allegation that those attempts occurred in D.C., nor provided any good faith reason to believe they did. To the contrary, PsiAN's website, as alleged by plaintiff, solicits members broadly from any reader without any targeted focus on D.C. As to PsiAN's attempts to solicit donations or otherwise "obtain[] revenue" here, Pl.'s Opp'n at 20, there has been no indication, either in the complaint or in the declarations filed by the parties, that PsiAN or the individual defendants have tried to collect donations from D.C. residents in any manner apart from the "Donate" button on their website's homepage, *id.* at 12. The defendants have also admitted that "[s]ince PsiAN's inception, it has received only two donations" from D.C. residents, one for $100 and another for $250. Michaels Reply Decl. ¶ 2. They have even gone so far as to admit that, after this case was filed, the APA awarded PsiAN a $6,000 grant. *Id.* ¶ 4. This admission, no matter how fulsome, is likely jurisdictionally irrelevant. *See, e.g., Steel v. United States*, 813 F.2d 1545, 1549 (9th Cir. 1987) (suggesting that "[w]hen a court is exercising specific jurisdiction over a defendant . . . the fair warning that due process requires arises not at the time of the suit, but when the events that gave

rise to the suit occurred").[5]  Moreover, a single $6,000 grant from a D.C.-based organization for a project that "does not anticipate any future activity in Washington, D.C." cannot be considered persistent in-District conduct.  Michaels Reply Decl. ¶ 4.  Defendants' memberships in trade or professional associations located in D.C. and their communications with D.C. residents made from outside the District are also irrelevant to the jurisdictional inquiry.  *See supra* Part III.B.1.

The remaining questions plaintiff intends to pose if jurisdictional discovery is allowed are so broad as to be barely distinguishable from the kind of "fishing expedition" courts should endeavor to forestall.  *FC Inc. Grp. LC*, 529 F.3d at 1094.  The proposed expeditions into "the individual Defendants' contacts with the forum" and the "extent of the business PsiAN transacts in the District" are founded on little more than speculation.  Pl.'s Opp'n at 20.  Jurisdictional discovery may be warranted on a slim record when an obstructionist defendant has hamstrung a plaintiff's efforts to adequately allege personal jurisdiction.  *See, e.g., Rundquist v. Vapiano SE*, 798 F. Supp. 2d 102, 120–21 (D.D.C. 2011) (allowing a plaintiff discovery when the defendants appeared to use a multi-layered corporate structure to avoid jurisdiction despite the fact "there [was] evidence of a cross-over of senior management" between the defendant and other related corporate entities).  Here though, the defendants have been forthright, going so far as to alert the plaintiff and the Court to post-suit contacts with the forum.  Michaels Reply Decl. ¶ 4.

Plaintiff has pointed to no good faith reason to believe jurisdictional discovery will achieve anything other than prolonging the pendency of this lawsuit and concomitant annoyance to the defendants.  The plaintiff's request for jurisdictional discovery is therefore denied.

---

[5]     At what point in time a defendant's contacts with a forum are considered in the personal jurisdiction inquiry has not, however, been conclusively settled by the Supreme Court.  *See* Todd David Peterson, *The Timing of Minimum Contacts After* Goodyear *and* McIntyre, 80 GEO. WASH. L. REV. ARGUENDO 1, 35–37 (2011).

## IV. CONCLUSION

Although D.C. law contemplates the exercise of personal jurisdiction over defendants whose out-of-District acts cause in-District injuries, because the plaintiff has failed to show any necessary plus factor, the defendants remain outside the reach of D.C.'s long-arm statute. The complaint must therefore be dismissed.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date: January 21, 2020

_____
BERYL A. HOWELL
Chief Judge